[Civ. No. 37094. Second Dist., Div. Four. Apr. 29, 1971.]

EASON MONROE, Plaintiff and Respondent, v.
WARREN S. GARRETT et al., Defendants and Appellants.

## COUNSEL

John D. Maharg, County Counsel, and Robert C. Lynch, Assistant County Counsel, for Defendants and Appellants.

A. L. Wirin, Fred Okrand and Laurence R. Sperber for Plaintiff and Respondent.

## OPINION

**KINGSLEY, J.**—This is an appeal by Warren S. Garrett, Adele M. Gomez and Arthur J. Fitzgerald, members of the 1968 Los Angeles County Grand Jury, from a summary judgment in favor of plaintiff requiring defendants to reimburse the County of Los Angeles in the sum of six cents, and from an order denying defendants' motion for summary judgment.[1]

Plaintiff brought the action as a taxpayer and representative of all taxpayers in Los Angeles County for a reimbursement by the grand jury for

---

[1]The notice of appeal states that it is from "the orders . . . granting plaintiff's motion for summary judgment and denying defendants' motion for summary judgment." The orders are not appealable. However, the record shows the entry of a formal summary judgment; we treat the notice as an appeal from that judgment.

the amounts spent by it in making certain recommendations in its report and in a press release. It is alleged that these expenditures were beyond the authority of defendants as grand jurors.

The only parts of the lengthy report and press release[2] that were challenged were the grand jury's recommendations that:

(1) The Educational Opportunities Program be closely examined to determine if qualified persons are being required by any persons or organizations to commit themselves to engage in militant campus activities as a condition precedent to acceptance into such college program, and

(2) After a faculty or student member has been bound over for trial in the superior court after a preliminary hearing or is indicted for a felony offense based upon criminal activity occurring at or adjacent to an educational facility such faculty member or student be suspended by the appropriate administrative head of such educational facility until the criminal charges have been resolved by trial, plea or dismissal.

The 1968 grand jury made the above recommendations after inquiring into three criminal cases involving large numbers of public offenses committed on college and high school campuses. These three criminal cases had been brought before the grand jury by the district attorney. Following hearings on these cases the grand jury returned indictments; trial was had, and numerous defendants were found guilty of various charges including conspiracy, false imprisonment, kidnaping, assault, disturbing the peace, malicious mischief, and trespassing.[3]

In two of the above cases (People v. Parks and People v. Apo) most of the defendants were engaged in the educational opportunities program at two of the state colleges located in Los Angeles County. The grand jury expressed a belief that persons who were accepted into the educational opportunities program were required to make a commitment to engage in militant activities in order to be accepted into the program. In the third case (People v. Castro) the grand jury was informed that defendant, a faculty member in the Los Angeles city school system, had been reinstated to a high school teaching position while charged with criminal acts on a high school campus.

The report and press release were made by the grand jury for the purpose of reducing crime. No independent investigation was made by it

---

[2]See Appendix A.

[3]People v. Castro, Los Angeles Superior Court No. A-232902; People v. Parks, Los Angeles Superior Court No. A-235325; People v. Apo, Los Angeles Superior Court No. A-239947.

into the administration of colleges and high schools, and all facts used in the report and press release were gathered at hearings in criminal cases presented to the grand jury by the district attorney. There is no objection by plaintiff to the remainder of the report and press release.

■ The only issues before the court are whether the above recommendations in the report and press release were beyond the jurisdiction of the grand jury, and if so, whether the grand jury is liable for the return of money spent in the course of making these recommendations. It must be pointed out that the wisdom of the report and press release is not before this court. We are called on only to determine the legality of those documents.

Defendants' acts were not beyond their authority as grand jurors. ■ The grand jury may inquire into all public offenses committed or triable within the county. (Pen. Code, § 917; *People* v. *Beatty* (1860) 14 Cal. 566.) Although the grand jury should not engage in fishing expeditions of its own, the Attorney General has the authority to direct the grand jury to investigate matters of public interest. (Pen. Code, § 923; (1962) 2 Santa Clara Law. 78, 82; see also *Samish* v. *Superior Court* (1938) 28 Cal.App.2d 685 [85 P.2d 305].) Even if the grand jury cannot initiate investigations and make recommendations it can investigate and make recommendations if the investigation grows out of legitimate inquiry into criminal or corrupt activity. ((1964) 52 Cal.L.Rev. 116, 122, 123.)

■ Plaintiff relies on the case of *Board of Trustees* v. *Leach* (1968) 258 Cal.App.2d 281, 288 [65 Cal.Rptr. 588]. In the *Leach* case the court held that a grand jury investigation into the evaluation of certified school employees, *as a matter of routine and not in connection with public offenses or official misconduct,* constituted an unwarranted interference with the affairs of the school board. Unlike the *Leach* case, in the case at bench the recommendations were not made as a matter of routine but were made in connection with bona fide inquiries into public offenses on campuses. *Leach* does not support plaintiff's theory of the case.

Plaintiff relies, also, on *Application of United Electrical, Radio & M. Workers* (S.D. N.Y. 1953) 111 F.Supp. 858, 864, and on *Hammond* v. *Brown* (N.D. Ohio 1971) 323 F.Supp. 326. Not only are those cases decided under provisions relating to grand juries which are not shown to be the same as those in California, but they involve totally different forms of report. In both of those cases, the grand jury had made specific and detailed charges of criminal activity against identified persons. To hold that, if a grand jury has data supporting that sort of report, it should act by returning indictments which then afford the individuals

charged with an opportunity formally to respond and clear themselves is no basis for saying that a grand jury cannot call attention to a situation having public importance but without charging any individual with any specific criminal act.

The only California case cited to us, or which we can find, actually sustained a report which went beyond the generalized comments before us in the case at bench. In *Irwin* v. *Murphy* (1933) 129 Cal.App. 713 [19 P.2d 292], a grand jury had investigated a boxing match in which one contestant was killed. The grand jury circulated a report indicating that boxing had become a racket. The report called for reforms and requested the resignation of the boxing commissioner and requested that the license of the referee be revoked. In a libel action against the grand jury, the *Irwin* court held that the grand jury has the right to report any matter it may investigate and that the report did not involve any person or subject beyond the scope of legitimate inquiry. The court held that it was not an excess of jurisdiction to investigate the principals, the promoters, the seconds, the referees, the boxing commissioner, and the regulations and laws under which the contest was held. If it was not an excess of jurisdiction for the grand jury in *Irwin* to suggest the revocation of the license of a referee and to examine the rules and regulations of boxing contests and make recommendations, then we see no reason why it is an excess of jurisdiction to recommend the suspension of teachers or students and recommend changes in the educational opportunities program.

The grand jury in the instant case was legitimately investigating crime on campuses, and, during the course of that investigation, it made peripheral recommendations aimed at preventing similar crimes. An article in the California Law Review notes that recommendations by the grand jury, after inquiry into criminal activity, aimed at preventing similar activity in the future are proper, as is a report including those recommendations. In examining the scope of the grand jury's powers the author states that, where recommendations follow a legitimate inquiry into criminal activity, there is no excess of authority. (See (1964) 52 Cal.L.Rev. 116, 123.)

In our system of government, a grand jury is the only agency free from possible political or official bias that has an opportunity to see the picture of crime and the operation of government relating thereto on any broad basis. It performs a valuable public purpose in presenting its conclusions drawn from that overview. The public may, of course, ultimately conclude that the jury's fears were exaggerated or that its proposed solutions are unwise. But the debate which reports, such as the one before us, would provoke could lead only to a better understanding of public governmental problems. They should be encouraged and not prohibited.

In view of our holding that the grand jury did not exceed its jurisdiction in making recommendations, we need not decide whether or not they would be liable in a taxpayer's suit for return of money spent in preparing those recommendations and report.

The judgment is reversed; the purported appeal from orders is dismissed.

Jefferson, Acting P. J., and Dunn, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied June 23, 1971.

### APPENDIX A

The part of the press release to which plaintiff specifically objects reads as follows:

"Let there be no mistake about the fact that meaningful changes resulting in improved levels of social, educational and economic attainment for citizens of all social, ethnic and cultural backgrounds stands highest on any list of priorities, and *the need for such progress has been of particular concern to the members of this Grand Jury*. We realize, however, that there are individuals who engage in both overt and covert activity in the area of civil strife whose *motives and purposes* should be subject to careful evaluation and scrutiny.

". . . [W]e therefore:

"     .     .     .     .     .     .     .     .     .     .     .     .     .     .     .

"(3) recommend that the Educational Opportunities Program, which permits disadvantaged persons to receive a college education, be closely examined to determine if qualified persons are being required by any persons or organizations to commit themselves to engage in *militant campus activities* as a condition precedent to acceptance into such college program. We are inclined to believe that *the recruitment and admission procedures currently utilized by various local colleges participating in the Educational Opportunities Program are in vital need of revision in order that the opportunities existing under such program be afforded those whose primary objective is obtaining a college education.*

"The 1968 Grand Jury is of the opinion that *it is inimical to the interest of an academic community* to permit a person charged with a felony offense arising out of acts of civil disobedience which occurred at or adjacent to an educational institution, to continue as a faculty member or student while such charges are still pending. ,

"*We,* therefore, *recommend that* after a faculty or student member has either been bound over for trial in the Superior Court after a preliminary hearing, or is indicted for a felony offense based upon criminal activity occurring at or adjacent to an educational facility, *such faculty member or student be immediately suspended by an appropriate administrative head* of such facility until the criminal charges have been resolved either by trial, plea or dismissal." (Italics supplied by respondent.)